## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Joseph R. Stromberger, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:16-cv-01117 |
| | ) | |
| vs. | ) | Judge Michael R. Barrett |
| | ) | |
| Tampico Beverages, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION & ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 36).  Plaintiff has filed a memorandum in opposition (Doc. 42),[1] to which Defendant has replied (Doc. 43).  For the reasons that follow, Defendant's Motion for Summary Judgment will be GRANTED.

I.  **FACTS**

**Background.**  Plaintiff Joseph R. Stromberger was born in 1959.  (Stromberger Dep., Doc. 37-1 PAGEID 312 (7:23–8:1)).  He began work for Defendant Tampico Beverages, Inc. ("Tampico") on February 2, 2009, at age 49.  (*Id.* PAGEID 314 (15:10–11), PAGEID 321 (44:5–7)).  Tampico sells a "base" to licensees, mostly dairies, much like Coca-Cola sells a syrup to bottling plants.  The dairies produce a punch per Tampico's formula and then distribute it to retail stores for direct sale to the public.  (*Id.* PAGEID 325–36 (61:11–62:25)).

---

[1] Plaintiff requests oral argument.  (Doc. 42 PAGEID 971 CAPTION).  The Court does not deem oral argument essential to the fair resolution of this matter, however, and thus denies Plaintiff's request.  *See* S.D. Ohio Civ. R. 7.1(b)(2).

Stromberger was hired as a director of national accounts, a position he held until he was terminated. (*Id.* PAGEID 321 (44:23–45:5)). He serviced Kroger and Save A Lot. (*Id.* PAGEID 322 (47:1–49:22); Thompson Dep., Doc. 37-3 PAGEID 567 (58:5–6)). Stromberger first reported to Jim Zaremski, vice-president of national sales. (Doc. 37-1 PAGEID 318 (30:14–21), 319 (36:17–24), 321 (44:11–16), 323 (52:16–20)). Zaremski, who was in his mid-to-late 50s, was terminated in either 2010 or 2011. (*Id.* PAGEID 318 (30:13–31:1 ("Jim was let go from Tampico about 10 months after I started.")); Doc. 37-3 PAGEID 536 (27: 7–12 (Jim left "[a]round 2011"))). After Zaremski separated from Tampico, Stromberger reported to Andy Thompson, born in 1961. (Doc. 37-1 PAGEID 323 (52:16–53:16); Doc. 37-3 PAGEID 513 (4:21–22), PAGEID 530 (21:2–17), PAGEID 565 (56:18–22)). At that time, Thompson served as vice-president of national accounts. (Doc. 37-3 PAGEID 527–28 (18:4–19:7)). Thompson, in turn, reported to Mark Kent, executive vice-president of sales and marketing, born in 1964. (Kent Dep., Doc. 37-5 PAGEID 760 (4:17–22), PAGEID 768 (12:10–21), 776 (20:7–11)).

Three other directors of national accounts also reported to Thompson: Corky Diaz de Leon (then 50 years old), Steve Siegel (then 55 years old), and (eventually) Mike LaRue (then 46 or 47 years old). (*Id.* PAGEID 530–31 (21:2–22:14)). All four directors had the "[s]ame basic duties, just different accounts." (*Id.* PAGEID 565–66 (56:18–57:2)). Diaz de Leon serviced Walmart, Tampico's "number one" account. (*Id.* PAGEID 566–67 (57:22–58:4); *see* Doc. 37-5 PAGEID 777 (21:7–13)). Siegel serviced Dollar General, Family Dollar, Big Lots, Dollar Tree, and Food Lion. (Doc. 37-3 PAGEID 567 (58:7–9)). LaRue managed "the Pepsi relationship". (*Id.* PAGEID 567 (58:10–18)). He worked to place Tampico's "twenty-ounce" (single serve bottle) with various convenience store

retailers as well as in the "drug channel," meaning CVS, Walgreens, and Rite Aid. (*Id.*). LaRue was also tasked with developing relationships with Kmart and Meijer supermarkets. (*Id.*).

Accounts are ranked by volume—that is, the number of Tampico gallons they purchase. (*Id.* PAGEID 567–68 (58:19–59:4)). At one point the top three accounts were Walmart, Kroger, and Save A Lot. (*Id.*). But, in 2016, Dollar General and Family Dollar eclipsed Save A Lot, "an account that continues to be on the decline." (*Id.* PAGEID 568–69 (59:5–60:13)). Kroger also was in a decline for several years prior to Stromberger's separation. (*Id.* PAGEID 569–72 (60:14–63:4)). Specifically, Kroger's volume went down in fiscal years 2014–2015, 2015–2016, and 2016–2017. (*Id.* PAGEID 572 (63:5–17)). Nonetheless Walmart and Kroger remain Tampico's largest accounts at one and two, respectively. (*Id.* PAGEID 574–75 (65:19–66:2)).

**Plaintiff's performance reviews.** Tampico's 1-2-3 rating system for employees is straightforward: it reflects whether a key performance indicator (KPI) or conduct objective[2] is unmet ("1"), met ("2") or exceeded ("3"). (*Id.* PAGEID 588–89 (79:13–80:24)). Stromberger's performance was reviewed annually by Andy Thompson. (Doc. 37-2 PAGEID 424–29, 484–501).

For 2009, Thompson gave Stromberger a "1" for "[r]espectful and courteous treatment of coworkers/customers," as well as for "[e]ffectively communicates with coworkers/customers" and "[c]ommunicates in a workplace appropriate manner[.]" (*Id.* PAGEID 425). For 2010, Stromberger showed improvement in two of those categories,

---

[2] (*See, e.g.,* Doc. 37-2 PAGEID 425 ("Section 2: Formula for Success 7 Elements")). The seven elements are Teamwork, Accountability, Motivation, Professionalism, Integrity, Creativity, and Outstanding Effort. (*Id.*).

receiving a "1.5".  (*Id.* PAGEID 427).[3]  In the comments section, Thompson noted, "Joe needs to continue to work on building relationships within the organization – insuring that he has a 'team' attitude."  (*Id.* PAGEID 429).  For 2011, Stromberger again received a "1.5" in these two communication categories, with Thompson noting in the comments section, "Joe has done a good job developing our [Save A Lot] relationship at Corporate and with the Houchens SAL Team.  Joe needs to continue on building bridges with Chicago Team – with a focus on the Finance Team."  (*Id.* PAGEID 484, 486).

Stromberger's 2012 review reflects that he met or exceeded all conduct objectives, including those related to communication with coworkers and customers.  (*Id.* PAGEID 488).  Noting that Stromberger had a "tough year" with Kroger and Save A Lot, Thompson wrote in the comments section, "Joe was successful in improving his working relationship with Finance Team – doing a great job cleaning up several issues on the accounting side in our favor.  Despite all the challenges Joe kept a positive attitude and worked to set up what should be a successful 2013."  (*Id.* PAGEID 490).  Stromberger's 2013 review likewise reflects that he met or exceeded all conduct objectives, including those related to communication with coworkers and customers, with one exception.  (*Id.* PAGEID 492).  But following "another tough year" with Kroger and Save A Lot, Thompson commented that it was "[c]ritical" for Stromberger to find a way to success tapping into all resources on the Tampico team."  (*Id.* PAGEID 494).  He was advised to "[e]ngage Tampico Team to help improve execution in Western Divisions – Food 4 Less, Ralphs, Frys, Smiths" and to "[f]ind [a]lternative [s]olutions to achieve KPI's and drive success across Kroger Divisions and SA[L]".  (*Id.*).  In 2014,

---

[3] The Court notes that the category "[e]ffectively communicates with coworkers/customers" does not appear on Tampico's pre-printed form in 2011.  (*See* Doc. 37-2 PAGEID 427).

Stromberger slipped back to a "1.5" regarding his treatment of coworkers and customers.

(*Id.* PAGEID 496). Thompson noted in the comments section:

> Joe had to deal with issues with the SAL Ambient buyer in 2014 – got through it – but we now are in a tough position to drive execution for 2015. Another case of finding a way to succeed. Joe needs to continue to work on how he interacts with the Tampico Sales Team – taking a positive attitude in dealing with adversity and challenges. It is a Team and everyone must view fellow teammates in a positive light. This is an area that Joe needs to improve in for 2015. It will take focus and effort to insure this happens – and there is no question it should happen.

(*Id.* PAGEID 497). Stromberger's 2015 review again reflects a rating of "1.5" as to treatment of coworkers and customers; he received an identical rating with regard to "[s]upports and encourages development of peers." (*Id.* PAGEID 498). Areas needing correction were finding "alternative solutions to insure objectives are met" and improving "interactions with the Tampico Regional Teams and Chicago Office." (*Id.* PAGEID 499). Thompson elaborated in the comments section:

> Rather than provide all the reasons a new approach or selling angle will not work – Joe needs to be open minded and demonstrate more of a "can do" attitude. Another year where it has to be stated that Joe needs to work on how he interacts with the Tampico Team. Everyone wants to succeed – and he can't let his frustration come across in his communication – a positive attitude needs to be displayed in dealing with other Regional Teams and the Chicago office. Not a question that Joe can improve in this area – as he has course corrected in the past on this front.

(*Id.*).[4] As a follow up to this review, Stromberger and Thompson met again on March 4, 2016. (*Id.* PAGEID 501). To improve in areas with a rating below a "2", Stromberger was counseled to "[i]nsure all correspondence and interaction with Team Members is courteous and professional" and "[r]ecognize we are all on the same team and want to

---

[4] Stromberger wrote "not fully agree" underneath his signature to this performance review. (Doc. 37-2 PAGEID 500).

achieve the same goal." (*Id.*). He was also counseled to "[u]tilize all resources available to find a way to succeed" and to "utilize all resources to identify trends, opportunities and drive success." (*Id.*). Stromberger and Thompson apparently agreed to meet 90 days later to measure Stromberger's 2016 performance to date. (*Id.*). That meeting, however, did not occur.

**Eichor email chain.** On June 3, 2016, Andy Thompson sent an email to Perry Eichor—one of Tampico's "important licensees in California"—about the prospect of installing display ready (1.5 liter) pallets at Food 4 Less, a West Coast grocery store chain. (Doc. 37-2 PAGEID 505–06; *see* Doc. 37-3 PAGEID 544–45 (35:22–36:6)). Stomberger was copied. (Doc. 37-2 PAGEID 505–06). Eichor responded:

> I already spoke to Jim Tone about Tampico's meeting w him yesterday. He is meeting with Andy Copeland middle of next week and after that wants to sit down with me and talk about what they can do to keep the 10 store test ongoing. I will work with Tampico to get an ongoing price that they can live with. How much are you willing to kick in? Also, you guys want to extend this beyond the 10 store test to other stores as well, right? So if I am going to talk to him about an ongoing price he can work with, I need to know what Tampico is willing to commit, and I need that quick, so I can put together a plan.

(*Id.* PAGEID 505). Stromberger, who was copied on Eichor's response, replied:

> **This is not** for the ten stores that are being tested at this time. Need a delivered cost if we can provide Tampico Display Ready Pallets to support 86 stores in Southern California during the 10/$10 promotions. **This has nothing to do** with what Tampico is willing to fund promotions. We estimate 860 pallets per 10/$10 promotion with 12 to 16 weeks of support. **This is nothing** you can speak with Jim about after August, I need to talk with the CM at Kroger Corporate. **This is why** I am asking you for delivered pricing.
>
> I also need the picture for the 1.5 Liter Pallet requested in February with the pallet successfully entered in the Kroger VIP System. **This has been requested since February 24th.**

(*Id.* PAGEID 504 (emphasis added)). Eichor wrote back:

Thanks for the insight Joe. Talk to Andy. I'm not committing any price to you unless I am in on the conversation with Jim Tone and potentially Andy Copeland. There are issues here that extend beyond what you are trying to do with the CM at Kroger Corporate. If you need my price today, then you already have it. If you can wait till after my discussion with Jim Tone next week, then maybe we can work on something.

**And I don't like the way you talk to me Joe, so stop with the demands and the complaining or we will quit dealing with you completely.**

**Andy, please talk to Joe.**

(*Id.* PAGEID 503–04 (emphasis added)). Stromberger answered:

**Wow, that is your reply.** I talk to you directly after my meeting with Marty on February 24th. You told me quote "I was a better salesman than you" since I was able to keep him interested in the 1.5 Liter Pallets, he needed a picture of the actual pallet, and you were to supply the following week. **None of what you have ever promised me has ever happened!** Three years ago at dinner you give me grief because you wanted more Kroger business, I hand this to you on a silver platter and it is like pulling teeth to make happen**. If you are going to threaten me about providing product to Kroger because you do not like the truth, fine, I will find someone else. I like dealing with people that have ethics!**

(*Id.* PAGEID 503 (emphasis added)).

Thompson testified that Eichor forwarded Stromberger's email[5] and then called him. (Doc. 37-3 PAGEID 551 (42:7–12)). Thompson then shared with Mark Kent what transpired between Stromberger and Eichor. (*Id.* PAGEID 553 (44:16–24)). Based on "this history with Joe," Thompson recommended his termination. (*Id.* PAGEID 553–54 (44:24–45:23); Doc. 37-5 PAGEID 785 (29:3–7)). Thompson and Kent then consulted with Elsa Burgos, senior director of human resources. (Doc. 37-3 PAGEID 554–55 (45:24–46:18); Burgos Dep., Doc. 37-4 PAGEID 712–15 (63:22–66:4); Doc. 37-5

---

[5] Review of the email chain makes clear that Stromberger immediately forwarded his answer to Eichor not only to Andy Thompson but also to Mark Kent. (Doc. 37-2 PAGEID 503).

PAGEID 788 (32:22–24)).

**Plaintiff's termination and this lawsuit.** Stromberger, then 57 years old, was terminated one week later. (Doc. 37-1 PAGEID 312 (9:3–11), PAGEID 321 (44:8–10)). He learned of Tampico's decision to separate him in a telephone call from Andy Thompson on June 10, 2016, with Elsa Burgos on the line. (*Id.* PAGEID 329 (74:2–75:14); Doc. 37-4 PAGEID 672–73 (23:16–24:9)). The call was brief. According to Thompson and Burgos, once Stromberger heard Thompson say that it was his "last day with Tampico," Stromberger became "very belligerent" . . . "[started] yelling" . . . "said he couldn't believe it" . . . "and hung up the phone." (Doc. 37-3 PAGEID 556 (47:9–19) & Doc. 37-4 PAGEID 715 (66:5–16)).

Stromberger originally filed suit in the Hamilton County Court of Common Pleas on November 1, 2016. (Doc. 6). The case was removed to the Southern District of Ohio on December 2, 2016. (Doc. 1). His First Amended Complaint (Doc. 27), filed October 3, 2017, alleges a single count of discrimination in violation of the federal Age Discrimination in Employment Act (ADEA). Tampico moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 56.

## II.  STANDARD OF LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all

reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. <u>ANALYSIS</u>

The ADEA protects "individuals who are at least 40 years of age" and prohibits an employer from discharging any individual "**because of** such individual's age." 29 U.S.C. §§ 623(a)(1) (emphasis added), 631(a). A plaintiff may establish age discrimination under the ADEA either by direct or by circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). The Sixth Circuit analyzes ADEA claims based on circumstantial evidence under the *McDonnell Douglas*[6] burden-shifting framework and, to establish a prima facie case of age discrimination, the plaintiff must show that he (1) was over 40 years old; (2) suffered an adverse employment action; (3) was qualified for the position he held; and (4) was replaced by a person outside the protected class. *Id.* at 622–23.

Regarding the fourth element, "[a]n allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). "[I]n the

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

9

absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Id.* at 284 (quoting *Grosjean v. First Energy Corp.*, 349 F.3d 322, 340 (6th Cir. 2003)). "[A]n age difference of ten or more years is generally considered significant," but "replacement of the employee by a person who is six to ten years h[is] junior must be considered on a case-by-case basis." *Id.* (citing *Grosjean*, 349 F.3d at 336, 340).[7]

If the plaintiff sets forth a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory basis for the termination. *Blizzard*, 698 F.3d at 283. If the defendant carries that burden, the plaintiff can survive summary judgment by demonstrating pretext. *Id.; see Spengler v. Worthington Cylinders*, 615 F.3d 481, 493 (6th Cir. 2010).

"To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). "For an employer to take an adverse action 'because of age' means that age was the 'reason' that the employer decided to act." *Scheick*, 766 F.3d at 529 (quoting *Univ. of Tex. Sw. Med. Ctr. v Nassar*, 570 U.S. 338, 350 (2013)) (cleaned up).

"*Gross* clarified that the burden of persuasion does not shift to the employer in an

---

[7] Alternatively, the plaintiff can satisfy the fourth element by showing that he "was treated differently from similarly situated employees outside the protected class." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004)). No such argument is made here.

ADEA case, 'even when a plaintiff has produced some evidence that age was one motivating factor in that decision.'" *Scheick*, 766 F.3d at 529 (quoting *Gross*, 557 U.S. at 180); *see Geiger*, 579 F.3d at 621 (explaining that "*Gross* overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination."). However, the "application of the *McDonnell Douglas* evidentiary framework to prove ADEA claims based on circumstantial evidence remains consistent with *Gross*" and "nothing in *Gross* undermines the principle that '[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.'" *Scheick*, 766 F.3d at 529 (citing *Kline v. TVA*, 128 F.3d 337, 348–49 (6th Cir. 1997)).

Plaintiff does not present direct evidence of age discrimination. Consequently, the Court will analyze his ADEA claim under the *McDonnell Douglas* framework and notes that his burden at the prima facie case stage is relatively light. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002); *see also Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013).

**Prima Facie Case.** Stromberger satisfies the first two elements, because he was over 40 years old at the date of his termination and his termination constitutes an adverse employment action. However, Tampico argues that he cannot establish the remaining two. (*See* Doc. 36 PAGEID 300–02).

"[T]o be considered qualified, 'an employee must demonstrate that he . . . was meeting the employer's legitimate expectations and was performing to the employer's satisfaction.'" *Most v. BWXT Nuclear Operations Grp., Inc.*, 743 F. App'x 664, 668 (6th Cir. 2018) (quoting *Gunthorpe v. DaimlerChrysler Corp.*, 90 F. App'x 877, 880 (6th Cir.

2004)). "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002); *see Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage . . . a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). Stated otherwise, "a court must be careful not to conflate the distinct stages of the *McDonnell Douglas* test." *Cicero*, 280 F.3d at 585.

Tampico maintains that Stromberger was not qualified for his position based on "his performance issues and lack of interpersonal skills with co-workers, customers and licensees." (Doc. 36 PAGEID 301). Under *Cline*, though, this argument is misplaced. (*See* Doc. 42 PAGEID 979–81).

Stromberger worked as a director of national sales for seven years prior to his termination. He managed the same two accounts—Kroger and Save A Lot—the entire time. As noted earlier, Kroger and Save A Lot were among Tampico's top three accounts until 2016, when Save A Lot dropped in volume.[8] And despite a downward trend that eventually "flattened" out, Kroger continues to be Tampico's second largest account (behind Walmart).[9] It defies logic that Tampico would trust accounts this important to an unqualified person for any period of time, much less for so many years.

---

[8] Of note, Thompson concedes that this drop in volume was not attributable to Stromberger. (Doc. 37-3 PAGEID 569 (60:8–13) ("Q. Is Save A Lot declining due to forces beyond the control of some employee at Tampico? A. Yeah, I think they're declining because of the rise of Walmart and ALDI. The retailer itself is declining, and everyone's business there is declining.")).

[9] (*See* Doc. 37-3 PAGEID 572–73 (63:5–64:10)).

Stromberger's performance reviews obviously do not paint a picture of an employee who exceeded expectations.  But the comments within could reasonably be interpreted to describe a competent employee tasked with reinventing his approach, both in-house and with customers, to increase sales in the face of Kroger's changing business model[10] and market share loss by Save A Lot.[11]  The reviews also confirm that Stromberger received modest pay increases each year, at odds with the notion that he was not performing to Tampico's "satisfaction" to some degree.[12]  The Court concludes, therefore, that the record evidence supports a finding that Stromberger was qualified for his position.  Thus, the third element is satisfied.

Tampico also maintains that Stromberger was not replaced by someone significantly younger.  (Doc. 36 PAGEID 301–02).  On this point the Court agrees.

"A person is replaced only when another employee is hired or reassigned to

---

[10] As Andy Thompson explained, "Kroger was in a decline for several years prior to Joe's leaving. It had to do with the current Kroger route-to-market, some changes – and then in the last couple years we made some changes with regards to how we promoted with Kroger, how – the aggressiveness of the pricing.  You know, go back three years ago when we were running ten-for-ten promotions, ten gallons, you know, one dollar a gallon so we went away from that, and just the – so the dynamics of that account changed.  And how Kroger – how we were able to affect – the Kroger business was changing, and they went from where at one time you would go out and talk to each Kroger division, and there was some autonomy for the divisions to kind of do different things, and they brought more and more of the business back into corporate in Cincinnati where more decisions were driven there, less autonomy out in the field. So with that change, that dynamic, losing the autonomy in some of the different major markets where Tampico – some markets were stronger than others, it certainly impacted our business, and that certainly led to kind of what the volume trends have been."  (Doc. 37-3 PAGEID 569–70 (60:16–61:17)).

[11] And, as one might expect in a performance review, not all the comments were negative.  They also include the occasional compliment.  For example, Thompson noted (regarding 2014), "Joe was able to achieve a plan across all parts of this business for the first time in 3 years – a big win."  (Doc. 37-2 PAGEID 497).

[12] Even Mark Kent's testimony reasonably points to Stromberger being qualified.  When asked why he was not terminated earlier, Kent replied, "we wanted to make sure there was every opportunity for Mr. Stromberger to improve on his performance, his attitude, and his expectations."  (Doc. 37-5 PAGEID 811 (55:4–10)).  Surely no rational employer would extend "every opportunity to improve" over a period of seven years if he did not have "at least the minimum attributes to perform the position."  *See Cicero*, 280 F.3d at 586.

perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). "A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'" *Robinson v. Georgia-Pac. Corrugated, LLC*, No. 1:18-CV-307, 2020 WL 473543, at *4 (S.D. Ohio Jan. 29, 2020) (quoting *Grosjean*, 349 F.3d at 336).

For the first three months after Stromberger was terminated, Thompson—just two years younger—took over Kroger and Save A Lot. (Doc. 37-3 PAGEID 573–74 (64:23–65:11), 576 (67:3–5, 18–22)). But ultimately a decision to restructure was made with two purposes: to better service Walmart and Kroger and to allow Thompson to grow sales with other "alternative" retailers. (*Id.* PAGEID 574 (65:12–66:10), 575–76 (66:3–67:2)). Thompson thus became vice-president of alternative business and assumed some account responsibility (including Save A Lot). (*Id.* PAGEID 575 (66:3–12), PAGEID 576–77 (67:5–68:1)). Steve Davis, hired by Tampico in 2010,[13] was promoted to vice-president of national sales, Thompson's former position, and was tasked with managing Walmart with Diaz de Leon and personally calling on Kroger.[14] (*Id.* PAGEID 573–74 (64:23–65:3), PAGEID 574 (65:12–16), PAGEID 575 (66:8–15)). Davis also was assigned the account for WinCo Foods. (*Id.* PAGEID 603–04 (94:14–95:3)). Applying *Grosjean*, because his work was "redistributed" to "existing employees" Thompson and Davis, Stromberger was clearly not replaced.

---

[13] (Doc. 40 PAGEID 839 (6:6–12)).

[14] Thompson testified that Mark Kent made the decision to promote Davis and to give him the Kroger account. (Doc. 37-3 PAGEID 577 (68:9–21)).

Stromberger nonetheless claims that Steve Davis, 20-years his junior,[15] replaced him because Davis assumed the bigger Kroger account.[16]  But whether Kroger was bigger than Save A Lot is irrelevant, and the restructure gave Davis shared (with Diaz de Leon) responsibility for behemoths Kroger and Walmart, in addition to the smaller WinCo Foods.  Stromberger insinuates that Tampico changed Davis' job title in "an attempt to avoid liability."  (*See* Doc. 42 PAGEID 982 (citing *Barnes*, 896 F.2d at 1465 n.10)).  Yet he fails to explain how a promotion to vice-president is a simple change in job title or how adding the two highest-volume accounts is a minor change in job description.

The lack of a younger replacement is not always fatal to a prima facie case of age discrimination, so long as the plaintiff points to "additional evidence," beyond establishing the first three prima facie elements, that indicates discriminatory intent in light of common experience.  *See Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009) ("[T]he *prima facie* inquiry was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (cleaned up); *accord Turner v. McCullough-Hyde Mem'l Hosp.*, No. 1:17-CV-339, 2020 WL 5798392, at *6 (S.D. Ohio Sept. 29, 2020), *aff'd*, No. 20-4159, 2021 WL 3661323 (6th Cir. Aug. 18, 2021); *Edelstein v. Stephens*, No. 1:17-CV-305, 2019 WL 3628824, at *26 (S.D. Ohio Aug. 6, 2019), *report and recommendation adopted*, No. 1:17-CV-305, 2020 WL 1846745 (S.D. Ohio Apr. 13, 2020), *reconsideration denied*, No. 1:17-CV-305, 2021 WL 1168254 (S.D. Ohio Feb. 22,

---

[15] Davis was born in 1980, making him significantly younger than Stromberger.  (*See* Davis Dep., Doc. 40 PAGEID 837 (4:16–20)).

[16] Stromberger does not claim to be replaced by Thompson, even though Thompson continues to manage Save A Lot.

2021). This "additional evidence" depends upon the particular facts and circumstances of the given case. *Lindsay*, 578 F.3d at 418. For example, in *Lindsay*, a case in which the Sixth Circuit analyzed the *McDonnell Douglas* framework in the housing discrimination context, the Sixth Circuit determined that the suspicious timing of the termination of a purchase agreement, within a few days after the seller discovered the buyers were African-American, provided a sufficient evidentiary basis for inferring the seller acted with a racially discriminatory motive. *Id.* at 419–20.

For his part, Stromberger argues "a corporate atmosphere of age bias" at Tampico such that "[n]umerous older employees in sales were let go and replaced with significantly younger individuals." (Doc. 42 PAGEID 981, 983).[17] He spotlights Jim Zaremski, the only Tampico employee (other than Stromberger) that Andy Thompson recommended be terminated for performance issues. (*See id.* PAGEID 983 (citing Doc. 37-3 PAGEID 536–38 (27:7–29:16)); *see also* Doc. 37-3 PAGEID 542–43 (33:20–34:7)). Neither side disputes that Jim Zaremski was in his fifties at the time he was terminated (in either 2010 or 2011) and was replaced by a younger employee (Thompson himself, albeit well over 40 years-old at the time).

In the Court's view, a reasonable jury could not infer an atmosphere of *any*thing based on two terminations occurring at least five years apart. Moreover, to infer bias would ignore the fact that the three other directors of national accounts who performed the "same basic duties" as Stromberger—*all* his contemporaries in age—remain

---

[17] Stromberger's First Amended Complaint alleges that, "Defendant has a **pattern** of terminating older employees and replacing them with significantly younger individuals." (Doc. 27 PAGEID 265 (¶ 15) (emphasis added)). To be clear, in the Sixth Circuit a "pattern-or-practice" method of proving discrimination is not available to an individual plaintiff. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004).

employed by Tampico.

Stromberger also argues that Thompson used (what Stromberger claims to be) an ageist stereotype during his deposition when describing why both Stromberger and Zaremski were terminated.  But again, no reasonable jury could infer discrimination when Thompson's testimony is viewed in context:

Q. And why did Joe Stromberger leave involuntarily?

A. There was a pattern of behavior with Joe, the way he would interact with fellow employees and sometimes with licensees, the Tampico bottlers.

He had a – he would – it was – a lot of times people would walk away from dealing with Joe, and there was actually some incidents with people in the home office.  People would walk away and felt that Joe was abrasive, combative, demanding, and they didn't feel like there was a sense of, hey, we're all in this together; we're on the same team.

I think Joe's frustration would sometimes come through, and it rubbed people the wrong way and there was a pattern of this behavior over several years.

**At the same time, the business softened up on Joe's primary accounts, Kroger and Save A Lot, and as the business was changing, it required us to step back and come up with new solutions, new ways of looking at the business, new ways of approaching the business.**

**Joe was often – you know, he wanted to do things one way, and he wasn't always open to suggestions that we need to try something different.  And when you would suggest, well, let's try this, Joe immediately would go to, well, that will never work, or I've tried that before.**

**When the business softens up, you've got to find new ways to drive solutions – you have to problem solve and find new opportunities, and Joe wasn't always open to that.**

**And quite often in me working with Joe and serving up, "Here's some opportunities for us to go after," it became very combative between Joe and I.**

17

And I think that led to an incident that took place in May of 2016 where Joe was working with a – one of our important licensees in California, and there was a request that Joe was making, and the licensee responded back saying I can't do this or I can't do it when you want me to do it, and Joe just lit into him in a very fiery e-mail where he said some things he shouldn't have said. He got personal.

Joe had had some run-ins with the licensee in the past and that Joe was always frustrated with this individual, and Joe just in my opinion went overboard. He went across the line, said some things he shouldn't have.

It was brought to my attention by the licensee, Perry Eichor. He was obviously upset with the way Joe was speaking to him.

I brought it to the attention of Mark Kent, and I just felt like here we go again with Joe, again with this abrasive, combative style which, you know, I mean, he crossed the line of what I felt to be – should be the last time, and the decision was made that – I said, I just think we need to part ways with Joe, talked to Mark about it, brought HR into the mix to talk about it.

They agreed based on looking at the facts, looking at the history that it was time to move on, and we basically put the call in to Joe to part ways.

**Q. I want to follow up on a number of things you said there. When you say the business was softening up, what does that mean?**

**A. The business was declining with Kroger.**

**Q. And was that Joe's fault, or was that driven by forces beyond his control?**

**A. Not necessarily – it was not necessarily Joe's fault the business was going down, but it was Joe's responsibility to bring the business back up.**

**Q. Okay. And that's when you were telling me that he wasn't open to looking at different ways of doing things?**

**A. Correct.**

**Q. Is it kind of similar to Jim Zaremski, not willing to adapt, that**

**sort of thing?**

**A. Yeah, it's similar.  Different individuals and situations, but –**

(Doc. 37-3 PAGEID 543–46 (34:8–37:21) (emphasis added)).  Reducing this exchange

to Thompson characterizing Stromberger as "stuck in his ways" or "not willing to adapt

and not open to change" is an oversimplification that overlooks Kroger's route-to-market

remodel as well as the Eichor email exchange.  It falls instead in the category of a single

comment too isolated to shoulder Stromberger's "relatively light" burden to produce

"common experience" evidence that supports an inference of age discrimination.  *See*

*Berry v. Frank's Auto Body Carstar, Inc.*, 495 F. App'x 623, 626–27 (6th Cir. 2012) ("You

guys are killing me on insurance" too isolated a comment to shoulder burden of showing

pretext in ERISA retaliation case) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154

F.3d 344, 355 (6th Cir. 1998)).

**Legitimate Reason for Termination and Pretext.**  Even if Stromberger had

stated a prima facie case, his age claim still could not survive summary judgment.

Andy Thompson testified that Stromberger's "fiery" email to licensee Perry

Eichor—against a backdrop of performance issues documented over a period of years—

sparked his decision to terminate.  (*See* Doc. 37-3 PAGEID 543–46 (34:8–37:3)).  His

testimony was confirmed by Mark Kent and Elsa Burgos.  (Kent Dep., Doc. 37-5 PAGEID

789 (33:16–20) ("Mr. Stromberger had performance issues for more than a couple of

years.  He had a lack of respect for employees and managers, and he also had a

combative personality including extremely unprofessional emails with customers."),

PAGEID 790 (34:9–13) ("There was an e-mail written by Mr. Stromberger that was

extremely unprofessional with one of our customers [Perry Eichor]."); Burgos Dep., Doc.

37-4 PAGEID 713 (64:16–23) ("The trigger decision was an e-mail [Stromberger] sent to – I don't remember if he's a licensee or a distributor, but I do remember his name, Perry, that didn't meet the standards of Tampico and how we conduct business and communication[.]")). Having reviewed the content of the "final straw" email, the Court concludes that Tampico has proffered a legitimate, non-retaliatory reason for Stromberger's discharge, shifting the burden to Stromberger to put forth evidence of pretext.

A plaintiff can demonstrate pretext in one of three ways. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). He can show that the stated reason (1) has no basis in fact or (2) was not the actual reason or (3) is insufficient to explain the employer's action. *Id.*; *see Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Notably, a plaintiff need only produce enough evidence "to rebut, but not to disprove" the employer's justification. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted).

There is no dispute, of course, that Stromberger sent the "overboard" email to Eichor, so it has a basis in fact. And the Court already has rejected Stromberger's proof that it was not the actual reason because Thompson "harbored stereotypic attitudes about older workers, Stromberger and Zaremski in particular."[18] (*See Berry*, 495 F. App'x at 626–27 (citing *Ercegovich*, 154 F.3d at 355)). At issue, then, is whether Stromberger can present evidence that the "tone" of his email fails to justify termination.

By way of explanation, Stromberger offers his own testimony that Kent told him (and others) to be "stern," "persistent," and "aggressive" with licensees "to make sure that

---

[18] (*See* Doc. 42 PAGEID 984–85).

they do what they say they're going to do"[19] and Thompson's testimony that he knew that "Joe had had some run-ins with this licensee in the past" and that "Joe was always frustrated[20] with this individual."[21]  But, specifically as to pretext, he refers to Elsa Burgos' testimony that Tampico uses progressive discipline except in cases of "gross misconduct"[22] and proposes that "even if the tone of the email could be considered rude or critical, it does not rise to the level of the 'gross misconduct' required for Tampico to skip progressive discipline and impose an immediate termination."  (Doc. 42 PAGEID 985).  Therefore, Tampico's failure to follow its own human resources policy raises a question of fact as to whether its reason is pretextual.  (*Id.*).

Unfortunately for Stromberger, his personal belief—that the "tone" of the email did not rise to the level of "gross misconduct"—is not the proper measure.  It is well established in the Sixth Circuit that courts (and juries) do not sit as "super personnel departments" that "second guess[ ] employers' business judgments."  *See Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) (citation omitted).  Burgos, in her capacity as senior director of human resources, testified unequivocally that she considered the email to be an example of gross misconduct for which termination was indicated.  (*See* Doc. 37-4 PAGEID 713–15 (64:16–66–4)).  Other than his own self-serving opinion, Stromberger points to no other record evidence that Tampico deviated from standard personnel procedure.  Because he has failed to rebut the stated reason

---

[19] (*See* Doc. 37-1 PAGEID 343 (131:17–22)).

[20] (*See also* Stromberger Dep., Doc. 37-1 PAGEID 343 (130:21–23) ("Perry is a very hardheaded man.  He is very stubborn.  He gets angry.")).

[21] (*See* Doc. 37-3 PAGEID 545 (36:7–9); *see id.* PAGEID 623–24 (114:8–115:5)).

[22] (Doc. 42 PAGEID 985 (citing Burgos Dep., Doc. 37-4 PAGEID 682 (33:2–11))).

underpinning his discharge, his age claim fails.  Tampico, therefore, is entitled to judgment as a matter of law.

### IV. <u>CONCLUSION</u>

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 36) is **GRANTED**.

**IT IS SO ORDERED.**

<u>/s/ *Michael R. Barrett*</u>
Michael R. Barrett, Judge
United States District Court